IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2015


IN RE: ESTATE OF GEORGIA MYERS SMELCER


Appeal from the Chancery Court for Greene County
No. 12P00043          Douglas T. Jenkins, Chancellor

———————————————

No. E2014-01499-COA-R3-CV – Filed June 22, 2015

———————————————


Hal H. Lane appeals the May 20, 2014 judgment of the Chancery Court for Greene County ("the Trial Court") finding and holding, *inter alia*, that Joseph J. Holt was the person who took care of Georgia Myers Smelcer ("Deceased") until her death and, therefore, inherited real property known as the Hartshaw Addition pursuant to the Last Will and Testament of Georgia Myers Smelcer. We find and hold that the evidence does not preponderate against the Trial Court's findings, and we affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

Jeffrey A. Cobble, Greeneville, Tennessee, for the appellant, Hal H. Lane.

Jerry W. Laughlin, Greeneville, Tennessee, for the appellee, Joseph J. Holt.

Douglas L. Payne, Greeneville, Tennessee, for appellee, the Estate of Georgia Myers Smelcer.

Judy S. Robinson, Greeneville, Tennessee, Administratrix ad litem for the Estate of Georgia Myers Smelcer.

Whittney N.L. Good, Greeneville, Tennessee, Guardian ad litem for unknown heirs of the Estate of Georgia Myers Smelcer.

# OPINION

## Background

Deceased died in January of 2012. Deceased's Last Will and Testament ("the Will") was admitted to probate, and Joseph J. Holt was appointed to serve as Administrator of Deceased's Estate. In pertinent part, Deceased's Will provides: "Property in Hartshaw Addition will go to the persons that take care of me until my death. If nobody does this it will be sold and go into the trust fund to help take care of me."

Mr. Holt filed a motion seeking guidance with regard to the construction of the above quoted portion of the Will, in addition to other things. Hal H. Lane filed a petition seeking to establish his status as a beneficiary under the Will and alleging, in part, that he qualified to inherit the property in Hartshaw Addition under the Will. The case proceeded to trial without a jury in April of 2014.

Mr. Holt testified at trial. He explained that he was the nephew of Glen Smelcer, Deceased's purported common law husband, who died in 1995. After Glen Smelcer's death, Mr. Holt continued to visit Deceased. Mr. Holt and Deceased also spoke regularly on the phone. Mr. Holt explained that Deceased's Estate contains, in addition to other items, two parcels of real property, the Hartshaw Addition property and approximately 6.4 acres on Hill in Gallahar. Mr. Holt stated that Hal Lane gets an acre and a half of the 6.4 acres in Gallahar pursuant to the Will, leaving around five acres left in that parcel after that specific bequest.

Mr. Holt testified that Deceased fell and fractured a hip and her pelvis in November of 2010. Prior to her fall Deceased was able to get around, was driving, and was functioning normally. Deceased called Mr. Holt when she fell. He told Deceased to call 9-1-1, and he then went to her home and accompanied her to the hospital. Mr. Holt stayed with Deceased and signed papers for her in the hospital. Mr. Holt testified that while Deceased was in the hospital after her fall he: "had keys, pocketbook, I carried her pocketbook with me. Every time I saw her, I had her insurance cards, her check books and everything."

Mr. Holt explained that Deceased had asked Mr. Holt prior to her fall to assist her with her financial affairs. Deceased had placed Mr. Holt's name on her checking account in May of 2010. Mr. Holt testified that "[s]he wanted help paying her bills, keeping track of her affairs, financial affairs. She had a shaky hand, couldn't write checks good . . . ." Mr. Holt testified that he was a signator on many of Deceased's checks and that he paid her monthly bills including cable and electric.

After her fall Deceased was in the hospital for almost a week and then was in a rehabilitation facility for a little over a month. Mr. Holt testified that he assisted in making the accomodations so that Deceased could return to her home after leaving the rehabilitation facility. Mr. Holt explained:

> I assisted. We hired a lady, interviewed at Laughlin Healthcare and hired a lady to take care of her when she did come home. We did a shower seat and helped the shower to where she could sit down and not stand up. The rest of the house was pretty much left as it was.

Mr. Holt testified that Deceased had a security system for her home. Mr. Holt: "had the, the code and the password and if it ever went off I was, they called the homeowner and if they don't answer then they call someone else and I was the first person they called after that." Mr. Holt testified that this arrangement was set up when Deceased had asked Mr. Holt to be at her house on the day the security system was installed.

Mr. Holt fed Deceased's three cats and watered Deceased's flowers while Deceased was in the hospital and then the rehabilitation facility. No one else had a key to Deceased's house at that time.

Deceased never drove again after her fall. Prior to her fall Deceased mowed her own lawn using a riding mower. After her fall Deceased did not mow her lawn. Mr. Holt was asked how Deceased's lawn was taken care of after Deceased's fall, and he stated: "We, she had a neighbor behind her that had somebody mowing their, her yard, so we hired him to take care of hers. He would mow it and weed eat and blow the trimmings off of the driveway every week. And I paid him at the end of every month."

Mr. Holt testified that after Deceased's fall he took her to all of her doctor's appointments. With regard to Deceased's doctor's appointments, Mr. Holt testified:

> Well, I took her to the doctor. They had my name so, make an appointment, they gave me the appointment. If there was a change in it they called her and they also called me at the same time. . . . I would sign her in at the desk and when we were called back I would go back with her to the exam, examining room and the doctor would tell me or look at me and tell what he was thinking and tell her at the same time or any questions or any procedure that he would recommend, share with both of us and give my input on any procedures. I know one procedure wasn't, they kind of

suggested it but at her age it was not really necessary and she didn't want to do it, so I told the doctor that, "We're not going to do that."

Mr. Holt also testified:

I took her quite often to the grocery store when she needed to go. When she got a little better, her, the person who was taking care of her, the lady we had hired, would go for some things and then when she got to where she could get around with a walker I would take her to the grocery store and some of the other, Kmart and some of those places she wanted to go.

After Deceased's fall Mr. Holt also took Deceased to visit the cemetary. Mr. Holt testified:

To take her places, she began to be able with a walker, one of those four wheel walkers, was walking better, but to travel past her, out of her yard or something, or a car, she did not drive. So she had to have somebody take her in a vehicle, if it was further than the driveway. . . . I did most of that, yes.

Mr. Holt spoke on the phone to Deceased "pretty much every other day, maybe, you know, you go a few days every day and then sometimes every other day. But yes, kept in close contact."

Mr. Holt was asked if Mr. Lane had a key to Deceased's house, and he stated: "Not on his person. There was a key that stayed outside, that he knew where it was at." Mr. Holt explained: "When she was not there, the key was taken. It was picked up and we carried it with us. So she, he had access to the home when she was in the house." Mr. Lane, therefore, had access to Deceased's house only when Deceased was there. Mr. Holt was asked why Mr. Lane would need a key if Deceased were at home, and he stated:

Because she kept her doors locked, so he could go inside. And because she didn't hear that well. He may be knocking on the door and not hear it, so that he could go in if she's in the house. We had a, we had a key, the key was there and it was also there for the lady that helped take care of her so she could come and not have to get, if [Deceased] was in bed, she could come in and go get her out of bed and help her get out. The key was outside. But when, when I and [Deceased] went to the doctor or whatever, we took the key with us. It was not left outside at that time. It was only put out when [Deceased] was in the house.

When asked if Mr. Lane had the security code for Deceased's security system, Mr. Holt stated:

> He did in the sense that [Deceased] would forget what it was, so he put it on a note, above the controller. So he was not given it, but it was displayed. So he had it because it was written on the wall, basically. The lady that took care of her had it because it was written on the wall. And because when that thing goes off, it gets loud. It would kind of upset [Deceased] and confuse her. So we put it there on the wall because if, just so she could find it. If we'd hidden it somewhere, she couldn't have found it then, so that's why actually anybody at that time, that came in the house, it was like I said, basically written on the wall. But we didn't use it, after she fell we didn't use it because we had a woman coming in every day. But [Deceased] like to, there's an automatic button that activates it or deactiviates it and she would carry it in her pocket in the house with her car keys. And it was always activated in the house so we didn't use it because she liked to carry those things. So it wasn't being used the last, since it, after she fell it was not used unless she was leaving the house, then I activated it.

Mr. Holt testified that Mr. Lane is the person who found Deceased dead in her home. He also testified that Mr. Lane did provide some personal services for Deceased. Mr. Holt stated: "He provided some in the later time. His health was, at first, so he didn't provide a lot and then he began to provide a little more. But I discussed with [Deceased] and we didn't charge him any rent for those services during that period of time after she fell." The rent Mr. Holt referred to was $50 per month in land rent that Mr. Lane paid to Deceased. Mr. Holt further stated: "if [Mr. Lane] would come around and help take care of the cats and helped around there, we would excuse the rent."

Mr. Holt was asked what types of things Mr. Lane did for Deceased, and he stated:

> Well, after she fell and he got back where he could go up and down the stairs, he took care of the two cats downstairs. He used to, before she fell, he would help her mow the yard, do the trimming, work in the garden. He got half of the garden. She generally worked along side of him unless she was fixing his dinner. So it was, they would go to the grocery store some, go over to Newport to various things, to shop down there and always took her car and she drove, I think.

When asked for how many years Mr. Lane did these things, Mr. Holt stated:

Well, as long as they lived in that house and I'm not sure, he can tell you how long they lived in that house. I don't remember when they bought it. But at least, at least after, after her husband died, at least from then on. I don't know what he did before then, but after he died, yes, he would do that from then. So we can establish '95, so he did it from, from '95 on, helped around, yes.

Mr. Holt was asked what his own role in Deceased's life was prior to May of 2010 when he was placed on Deceased's accounts, and he stated:

More or less she was my aunt and she would call me from time to time about matters that she would like a little extra input in, some advice on. She would call me for that. As far as doing anything, I didn't do anything. She, like I said, would ask my advice on various things. I would visit. But just more or less advisory matters. When she bought her car in 2007, she wanted me to go to Newport with her when she bought the car, wanted me to look at that and see I thought it was a good deal. So just stuff like that.

Sally Hamilton testified that she was a friend of Deceased's for a "little over five years." Ms. Hamilton and Deceased visited one another and talked on the phone "each day." Deceased told Ms. Hamilton that she had made a Last Will and Testament. Deceased also told Ms. Hamilton that "Joe" was to receive the Hartshaw property upon Deceased's death "[b]ecause he had done everything to help her. He was always there. He took her to the doctor. He done everything that needed to be done." Ms. Hamilton testified that Deceased had two cats and that "[s]he said Joe changed them and took care of them every time they needed it." Ms. Hamilton was asked if Mr. Lane took care of the cats, and she stated: "She never did tell me that." Ms. Hamilton testified that Deceased had told her that Mr. Holt took her to doctor's appointments and to other places both before and after Deceased fell.

Hal H. Lane testified that he lived about two and a half miles from Deceased's house. Mr. Lane testified that he got to know Deceased and her husband when he worked for Pilot Oil Company and both Deceased and her husband worked for him. Mr. Lane explained that they became friends and continued a personal relationship even after they no longer worked together. Mr. Lane testified that he helped Deceased and her husband move to Greeneville "[p]robably in the mid '70s, '77, '78, somewhere in there."

Mr. Lane was asked about how he came to put his mobile home on Deceased's real property, and he stated:

Glenn had a lot down there off of Gallahar Lane and he, he had a trailer on there and nobody was going to live in it. So he told me he would have that trailer took off and bought a trailer and put in there. He took, let me have lot rent and later he said, "I'll give you an acre and a half if you'll help take, help take [Deceased] til she dies."

Mr. Lane paid $50 per month in lot rent to Deceased. He paid this rent for "[p]robably 30 year, 30 some years." Mr. Lane was asked about Mr. Holt's testimony regarding the excused rent, and he stated: "After she got sick, when I started going more often to feed her cats, she, Joe and her talked it over and they decided that they wouldn't charge me rent then." Mr. Lane stated that the rent was excused "[p]robably for a year or longer." Deceased left Mr. Lane an acre and a half on Gallahar Lane in the Will.

Mr. Lane was asked what types of things he helped Deceased with, and he stated: "I helped her do, do the yard when she would mow and I'd weed eat, spray Round Up and help her in the garden, and set her flowers out, trim her, trim her trees, and just kind of things outside." He did this because he had "promised Glenn I'd help take care of her and he said she'll take care of you later." Every week during the summer Mr. Lane would weed eat, trim shrubs, and help Deceased with the garden. Mr. Lane testified that he had done this for at least 30 years. When asked what he did with regard to the garden, Mr. Lane stated:

> I tilled it up and I helped her plant everything, then I'd help her harvest and, and some things she would just give, she would give me some things out of it, but not all of it, but she give me some things. We'd sort of divide the garden stuff.

He also testified: "I helped her cook some, washed her dishes."

Mr. Lane testified that prior to Deceased's fall: "We done [Deceased and he] everything together. . . . We'd go drive around cemeteries in Newport and we'd just get out and ride." Mr. Lane did this because Deceased asked him to. Before Deceased's fall Mr. Lane would go shopping with Deceased and take her to some of her appointments with the eye doctor or the hairdresser. Mr. Lane testified that before Deceased's fall he would be with Deceased "[a]t least every Saturday and I'd come by some nights and check on her when I'd come, got off of work." He stated that after Deceased's fall "things changed when I was able I went more times than I did before she fell."

Mr. Lane was asked to describe the relationship between Deceased and Mr. Holt, and he stated: "Joe did a lot, he done the business side and, he also fed the cats and stuff,

too." With regard to Deceased's cats, Mr. Lane stated: "I fed them a lot of times and Joe fed them a lot of times."

Mr. Lane testified that he had some health problems himself and "had to take off [assisting Deceased with things] for a while." He stated: "When I wasn't able, Joe done it and when I was able I done it for Joe." Mr. Lane stated that there was a period of four or five months after he had surgery when he could not assist Deceased during which Mr. Holt did everything for Deceased. Mr. Lane explained that he had two surgeries and after one his recovery was about five or six months and after the other his recovery was about three or four months. Mr. Lane's surgeries were in 2008 and 2011.

Mr. Lane's wife Linda Lane testified at trial. Ms. Lane testified that she knew Deceased for approximately 32 years. Ms. Lane was asked if she also had helped Deceased, and she stated: "Not like [Mr. Lane] did. I would go and help a little bit with, when we'd work in the garden and things, occasionally. But I have diabetes real bad and I can't get down and up. But [Mr. Lane] went at least every other day to check on her and help her." Ms. Lane testified that Mr. Lane had done this for "close to 30 years, off and on." Ms. Lane testified that her husband helped Deceased in the garden, helped mow Deceased's yard, helped with housework when Deceased was unable to do it, fed Deceased's cats, and took Deceased to the doctor, the grocery store, or the fruit stand. Ms. Lane was asked about how frequently Deceased would call her home asking for Mr. Lane to assist Deceased, and she stated: "Oh, maybe sometimes three and four times a week. And if she couldn't, if he wasn't at home and she couldn't reach him at work, she would go up to his work to make sure that he'd come by and do what she needed done."

After trial the Trial Court entered its Judgment on May 20, 2014 incorporating its Memorandum Opinion by reference and finding and holding, *inter alia*: "Because the Court has found that Joseph J. Holt is the person who took care of the Decedent, the Administrator ad litem be and is hereby directed and authorized to execute a deed on behalf of the estate conveying all of the property of the Decedent's in the Hartshaw Addition to Joseph J. Holt." In its Memorandum Opinion the Trial Court specifically found and held, *inter alia*:

> Then that takes me to the claim, the various claims and request for relief filed by Mr. Lane. And The Court thinks that Mr. Lane has very dutifully served the decedent. And The Court finds, there's very little disagreement in this room he did some, some things that may look to us, as onlookers, like little piddly things, but really to her it sounds like they were very important things. Because she was, you know, she wanted that garden taken care of. She wanted that yard mowed. She wanted those cats fed. And I think that Mr. Lane's wife testified that if he wasn't around, she'd go

looking for him. She would call him. If she couldn't find him, she'd go looking for him. . . . So in connection with his request to receive a part of the Hartshaw Addition property, The Court's going to deny that relief because it seems that she relied really on, on Mr. Holt for that. And The Court's already ruled he gets the Hartshaw Addition property.

But I do think that the services that Mr. Lane provided were in connection with an implied contract for him to be paid for those services. He was promised this acre and a half lot for, in connection with what he did. And in fact, they were true to him, they gave him the acre and a half lot. But The Court finds that, based on what he did, he should be compensated a little bit more than that. And in an effort to be equitable and fair with him, The Court's going to give him $25,000.00 in addition to the one and one-half acre lot.

Mr. Lane appealed the Trial Court's Judgment.

## Discussion

Although not stated exactly as such, Mr. Lane raises one issue on appeal: whether the evidence preponderates against the Trial Court's finding that Joseph Holt and not Mr. Lane was the person who took care of Deceased until her death. Mr. Lane also filed a motion seeking leave to supplement his principal brief on appeal to add references to the record on appeal. Mr. Lane's brief on appeal is deficient in that it fails to comply with Tenn. R. App. P. 27 and R. Ct. App. 6. Given the issue raised on appeal, however, in the exercise of our discretion pursuant to Tenn. R. App. P. 2 we will proceed to consider the issue raised. *Diggs v. LaSalle Nat'l Bank Assoc.*, 387 S.W.3d 559, 563-64 (Tenn. Ct. App. 2012). We, therefore, deny Mr. Lane's motion to supplement his principal brief as moot.

The issue raised on appeal involves the Trial Court's construction of the Will. This Court discussed the standard of review to be applied in cases involving the construction of a will in *Horadam v. Stewart* stating:

The construction of a will is a question of law for the court; therefore, we review the trial court's conclusions of law *de novo* affording them no presumption of correctness. *In re Estate of Milam*, 181 S.W.3d 344, 353 (Tenn. Ct. App. 2005). In cases involving the construction of wills, the cardinal rule "is that the court shall seek to discover the intention of the testator, and will give effect to [that intent] unless it contravenes some rule of law or public policy." *Stickley v. Carmichael*, 850 S.W.2d

-9-

127, 132 (Tenn. 1992) (quoting *Bell v. Shannon*, 212 Tenn. 28, 367 S.W.2d 761, 766 (Tenn. 1963)); *see also In re Crowell*, 154 S.W.3d 556, 559 (Tenn. Ct. App. 2004); *McBride v. Sumrow*, 181 S.W.3d 666, 669 (Tenn. Ct. App. 2005). Furthermore, in will construction cases, we rely on the language of the instrument to determine the testator's intent:

> [T]he testator's intention must be ascertained from "that which he has written" in the will, and not from what he "may be supposed to have intended to do," and extrinsic evidence of the condition, situation and surroundings of the testator himself may be considered only as aids in the interpretation of the language used by the testator, and "the testator's intention must ultimately be determined from the language of the instrument weighed in the light of the testator's surroundings, and no proof, however conclusive in its nature, can be admitted with a view of setting up an intention not justified by the language of the writing itself."

*In re Cromwell*, 154 S.W.3d at 559 (quoting *Nichols v. Todd*, 20 Tenn. App. 564, 101 S.W.2d 486, 490 (Tenn. Ct. App. 1936)); *see also* Pritchard on Wills §§ 384, 387, 388, and 409 (2d. ed.). Our Supreme Court has said that when ascertaining the testator's intent by construing the language used in a will, we must consider the entire will as a whole. *In re Estate of Vincent*, 98 S.W.3d 146, 150 (Tenn. 2003).

*Horadam v. Stewart*, M2007-00046-COA-R3-CV, 2008 WL 4491744, at *5 (Tenn. Ct. App. Oct. 6, 2008), *Rule 11 appl. denied April 27, 2009*.

 "Generally, parol or extrinsic evidence may not be used to vary, contradict, or add to unambiguous language used in a will," however, such evidence may be used if the will contains a latent ambiguity. *Id*. As this Court explained in *Horadam*:

> An ambiguity is "[a]n uncertainty of meaning or intention, as in a contractual term or statutory provision." . . . Our courts have routinely held that a latent ambiguity exists when "the equivocality of expression or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer[.]" Moreover, a latent ambiguity is "susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the

words and phrases made use of."

Simply defined, a latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Latent ambiguities most often arise in relation to the person and the thing identified in the document and "exist when the words of a written instrument are plain and intelligible, yet have capability of multiple meanings given extraneous facts." For example, a latent ambiguity regarding the subject or thing would arise if a testator devises a parcel of his property "X" but has two parcels, "North X" and "South X." Extrinsic evidence is then admissible to identify the property or person the testator intended to describe.

Alternatively, a patent ambiguity exists when the ambiguity results from the language or wording in the instrument. A patent ambiguity is one that clearly appears on the face of a document, "[p]roduced by the uncertainty, contradictoriness, or deficiency of the language of an instrument, so that no discovery of facts, or proof of declarations, can restore the doubtful … sense without adding ideas which the actual words will not themselves sustain."

*Horadam*, 2008 WL 4491744, at \*\*5-6 (citations omitted) (italics in original omitted).

The Will contained a latent ambiguity requiring the Trial Court to determine who qualified as a person or persons who took care of Deceased until her death. If a testator's intent is determined, in part, through extrinsic evidence, we review the trial court's findings of fact *de novo* with a presumption of correctness. *In re: Estate of Luther Gaston Garrett*, No. M1999-01282-COA-R3-CV, 2001 WL 1216994, at \*5 (Tenn. Ct. App. Oct. 12, 2001), *no appl. perm. appeal filed*.

In the case now before us the Trial Court found that while Mr. Lane did perform some services for Deceased and that those services were important to Deceased, Mr. Holt was the person that Deceased "relied really on . . . ." The evidence in the record on appeal shows that Mr. Holt assisted Deceased with her financial affairs from May of 2010 until Deceased's death in January of 2012. The evidence shows that Mr. Holt's name was on Deceased's checking account and that Mr. Holt paid Deceased's bills. During Deceased's hospital stay after her fall Mr. Holt kept and safeguarded Deceased's keys, pocketbook, insurance cards, and checkbooks. Mr. Holt signed papers at the hospital for Deceased. The evidence in the record also shows that Mr. Holt was listed with the security company who provided the security system for Deceased's house as a

party to call in the event of problems should the security company be unable to reach Deceased.

Mr. Holt took Deceased to her doctor's appointments and Deceased arranged for Mr. Holt to receive telephone calls from her doctors. Mr. Holt also accompanied Deceased into the examining room when she saw her doctors and participated in the discussions regarding Deceased's treatment. The evidence shows that Mr. Holt made arrangements to allow Deceased to return to her home after her stay in the rehabilitation facility and also made arrangements for someone to mow Deceased's lawn after her fall. Mr. Holt then paid the person who mowed Deceased's lawn. Mr. Holt fed Deceased's cats and watered her flowers during Deceased's hospital stay.

The evidence in the record on appeal also shows that Mr. Holt was involved in making the decision to excuse Mr. Lane's rent for a period of time after Deceased's fall. Mr. Lane himself testified that Mr. Holt was involved in the decision to excuse Mr. Lane's rent.

In contrast, the Trial Court found that the services provided by Mr. Lane to Deceased were in "connection with an implied contract . . . ." The Trial Court found that Mr. Lane "was promised this acre and a half lot for, in connection with what he did." The evidence in the record on appeal shows that Mr. Lane did receive a specific bequest in the Will of "a one and one half acre lot on which his trailer is now located off highway 321." The evidence in the record on appeal further shows that while Mr. Lane assisted Deceased with tasks such as gardening, feeding Deceased's cats, and accompanying Deceased to a variety of places, Mr. Lane was not the person whom Deceased relied upon for financial or medical matters.

The evidence in the record on appeal does not preponderate against the Trial Court's findings as dicussed fully above. As such, we find no error in the Trial Court's finding that "Joseph J. Holt is the person who took care of the Decedant . . ." pursuant to the Will. We affirm the Trial Court's May 20, 2014 Judgment.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Hal H. Lane, and his surety.

_____
D. MICHAEL SWINEY, JUDGE